**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| SHANE MALLON, | * | |
| Plaintiff, | * | |
| v. | * | Civil No.: BPG-19-795 |
| FROSTBURG STATE UNIVERSITY, et al., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Shane Mallon ("Mallon," or "plaintiff") brings this action against defendants Frostburg State University ("FSU") and the State of Maryland d/b/a Frostburg State University (collectively, "defendants") alleging that defendants discriminated against him on the basis of his disability in violation of the Americans with Disabilities Act and the Rehabilitation Act of 1973. (ECF No. 2 at 11–16). Currently pending before the court are: (1) Defendants Frostburg State University and the State of Maryland's Motion to Dismiss or, in the Alternative, for Summary Judgment ("defendants' Motion") (ECF No. 18); (2) Plaintiff's Response in Opposition to Defendants Frostburg State University and the State of Maryland's Motion to Dismiss or, in the Alternative, for Summary Judgment and Request for Hearing ("plaintiff's Opposition") (ECF No. 22); and (3) Reply of Defendants in Further Support of Their Motion to Dismiss or, in the Alternative, for Summary Judgment ("defendants' Reply") (ECF No. 23). A motions hearing was held on August 5, 2019. (ECF No. 26). Prior to the hearing, defendants filed a Supplemental Brief. (ECF No. 25). After the hearing, plaintiff filed an unsworn affidavit. (ECF No. 29). For the reasons stated below, defendants' Motion (ECF No. 18) is denied.

# I.    <u>STANDARD OF REVIEW</u>

The purpose of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a complaint. <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999). When ruling on such a motion, the court must "accept[] all well-pleaded allegations in the plaintiff's complaint as true" and "draw[] all reasonable factual inferences from those facts in the plaintiff's favor." <u>Id.</u> at 244. Nonetheless, "[t]he mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012) (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). Rather, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." <u>Ashcroft</u>, 556 U.S. at 678 (internal citation and quotation marks omitted). A plaintiff satisfies this standard not by forecasting evidence sufficient to prove the elements of the claim, but by alleging sufficient facts to establish those elements. <u>Walters</u>, 684 F.3d at 439. Accordingly, "while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" <u>Id.</u> (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

Here, however, defendants filed a "Motion to Dismiss or, in the Alternative, for Summary Judgment" (ECF No. 18), and both parties attached supporting exhibits to their filings. "[W]hen matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." <u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 260–61 (4th Cir. 1998) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks omitted) (alteration in the original).

Here, because the court will consider matters outside of the pleading, defendants' Motion will be construed as a motion for summary judgment.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is properly considered "material" only if it might affect the outcome of the case under the governing law. Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); Pulliam Inv. Co., Inc. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987). On those issues for which the nonmoving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or nonmoving party, but considers whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. Anderson, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party, however, may not rest on its pleadings,

but must show that specific, material facts exist to create a genuine, triable issue. <u>Celotex</u>, 477 U.S. at 324. A "scintilla" of evidence in favor of the nonmoving party, however, is insufficient to prevent an award of summary judgment. <u>Anderson</u>, 477 U.S. at 252. Further, "mere speculation" by the nonmoving party or the "building of one inference upon another" cannot create a genuine issue of material fact. <u>Cox v. Cty. of Prince William</u>, 249 F.3d 295, 299–300 (4th Cir. 2001). Summary judgment should be denied only where a court concludes that a reasonable jury could find in favor of the nonmoving party. <u>Anderson</u>, 477 U.S. at 252.

## II.    <u>BACKGROUND</u>

In 2017, plaintiff enrolled as a student at FSU for the fall semester. (ECF No. 22-2 at 3). That fall, however, plaintiff received a warning that he had not complied with FSU's immunization policy and that his student account could be put on hold. (ECF No. 18-1 at 3). FSU's immunization policy "requires all students to be immunized or show proof of immunity for measles, rubella, diphtheria, tetanus and mumps, and have documentation of such immunity on file with the Brady Health Center (which is [FSU's] medical center)." (<u>Id.</u>) On October 24, 2017, plaintiff met with Darlene Smith, the Nurse Practitioner and Director of the Brady Health Center, regarding this issue. (<u>Id.</u>) Plaintiff stated that he had been diagnosed with a medical condition, rheumatoid arthritis, that he takes immunosuppressive medications to treat this condition, and that he therefore cannot receive vaccinations. (ECF No. 22-2 at 2, 4). In response, Ms. Smith stated that he could comply with the immunization policy by (1) obtaining his childhood vaccination records; (2) taking a measles, mumps, and rubella ("MMR") antibody titer's blood test "to see if his childhood vaccines still provided him with immunity;" or (3) signing a religious exemption waiver "acknowledging that he would be identified as at risk for

4

illness in the event of an outbreak on campus and be required to stay away from campus." (ECF No. 18-1 at 2–3). Plaintiff advised that he was previously vaccinated as a child in Ireland, but that he had no way to obtain his immunization records. (Id. at 3). He also stated that he received a tetanus vaccine in Baltimore in 2011. (Id. at 4). Ms. Smith informed plaintiff that he could complete a form to have his tetanus shot record sent to the Brady Health Center, but plaintiff declined. (Id.) Plaintiff also declined to take an MMR blood test or sign a waiver at that time. (Id.) Ms. Smith did, however, temporarily lift the hold on plaintiff's account to allow plaintiff to register for classes for the winter and spring semesters. (ECF No. 22-2 at 4).

In the spring of 2018, plaintiff had two holds on his account that prevented him from registering for classes for the summer and fall semesters. (Id.) The first hold was a financial hold. (Id.) On December 19, 2017, plaintiff took out a temporary, emergency student loan for $1,000 and, according to FSU's standard policy, a hold was placed on plaintiff's account pending repayment of the loan, which was due on February 28, 2018. (ECF No. 18-1 at 4). Although plaintiff did not repay the loan by February 28, 2018, the hold was temporarily lifted to allow plaintiff to register for classes, and permanently removed on August 21, 2018, when plaintiff repaid the loan. (Id.) The second hold, from the Brady Health Center, resulted from plaintiff's noncompliance with FSU's immunization policy, as plaintiff had not taken an MMR antibody titer's blood test, signed an exemption form, or provided his vaccination records. (Id.) Plaintiff received an email from the Brady Health Center on February 12, 2018, warning him that the hold would go into effect the following week if he did not comply with the immunization policy, as well as a reminder email on February 27, 2018. (ECF No. 23 at 4–5). Plaintiff received another email on March 15, 2018, warning him that he would be blocked from

registering for classes after spring break if he did not comply with the immunization policy. (Id. at 5). Plaintiff failed to do so, and the Brady Health Center hold was placed back onto plaintiff's account on March 28, 2018, which prevented him from registering for classes for the fall semester. (Id. at 5–6).

On March 30, 2018, plaintiff was emailed by Jeff Graham, FSU's Assistant Vice President of Student Affairs, and notified of the hold on his account. (ECF No. 22-2 at 6). On April 2, 2018, Tom Bowling, FSU's Vice President of Student Affairs, who was copied on the March 30 email, responded to the email and asked plaintiff to come by his office that afternoon. (Id.) Plaintiff met with Mr. Bowling, but they were unable to resolve the issue. (Id.) Plaintiff alleges that Mr. Bowling told him to "get a lawyer." (Id.) Plaintiff then met with FSU's general counsel, Bradford Nixon, who informed plaintiff that he could sign a religious exemption waiver as an alternative to documenting his immunizations. (ECF No. 18-1 at 5). Plaintiff declined and stated that signing a religious waiver would compromise his principles. (Id.) FSU also offered plaintiff the option of signing a newly created waiver[1] "for reasons of conscience," but plaintiff declined again, informing Mr. Bowling that his attorney had instructed him not to sign anything. (Id.) Plaintiff also alleges that Mr. Nixon advised plaintiff to have his doctor send a medical waiver to the school and told plaintiff that "this issue is worth fighting for but it will be tough because [p]laintiff will be going up against the State of Maryland." (ECF No. 22-2 at 7).

After speaking with Mr. Bowling and Mr. Nixon, plaintiff met with Ms. Smith again and asked her to lift the hold on his student account so that he could register for classes. (ECF No. 18-1 at 5). He offered to take online only classes during the fall semester and stated that he

---

[1] While plaintiff refers to this waiver as a "philosophical waiver" (ECF No. 22-2 at 27), I will refer to this waiver generally as a "religious waiver" from this point forward.

would transfer after that semester.  (ECF No. 22-2 at 8).  He also asked Ms. Smith to release his transcripts so that he could apply to transfer out of FSU.  (Id.)  Ms. Smith declined to do so and did not lift the hold on plaintiff's account.  (Id.)  Finally, after his meeting with Ms. Smith, plaintiff met with Beth Hoffman, FSU's American with Disability Act/Equal Employment Opportunity and Immigration Compliance Coordinator.  (Id. at 8–9).  Plaintiff alleges that Ms. Hoffman also told him to have his doctor send a medical waiver.  (Id. at 9).

After plaintiff met with these individuals, on April 6, 2018, plaintiff's doctor, John Miller, M.D., faxed FSU a letter that stated "I have had the pleasure of taking care of Mr. Mallon since March 2018, but his autoimmune condition has required treatment for several years.  Due to his immunocompromised state, Mr. Mallon is not eligible to receive live vaccinations, such as the MMR vaccination.  Please do not hesitate to contact me if you have any questions or concerns." (ECF No. 22-2 at 9).  Ms. Smith reviewed this letter and noted that it did not address plaintiff's 2011 tetanus vaccination or his eligibility for non-live vaccinations, such as tetanus and diphtheria.  (ECF No. 18-1 at 5).  Ms. Smith then contacted Dr. Miller's office and asked whether plaintiff could take a MMR antibody titer's blood test.  (Id.)  She was told that they would contact plaintiff about the test.  (Id.)  Ms. Smith also faxed Dr. Miller a letter noting that plaintiff "was advised that he needs to provide laboratory proof of immunity to measles, mumps and rubella since he cannot produce his childhood vaccination records."  (ECF No. 23-3 at 22).  Ms. Smith further noted that, even with Dr. Miller's letter advising a medical contraindication to the MMR vaccine, plaintiff would still be considered susceptible in the event of an outbreak on campus.  (Id.)  If plaintiff took the MMR antibody titer's test, however, the test would show if he previously received a MMR vaccine.  (Id.)    Finally, Ms. Smith informed Dr. Miller that

"[u]niversity immunization policy also requires an updated Td/Tdap every 10 years if that can be administered to [plaintiff]." (Id.)

On April 9, 2018, plaintiff emailed Ms. Hoffman and asked again about lifting the hold so that he could register for two online classes. (ECF No. 22-2 at 10). On April 10, 2018, Ms. Hoffman responded that she had sent his doctor's letter to the Brady Health Center and left an email and phone message requesting that the hold be lifted. (Id.) That same day, plaintiff met with FSU's President, Ronald Nowaczyk, for "a couple minutes," and plaintiff alleged that President Nowaczyk stated that he would be fine if he got the note from his doctor. (Id.) A day or two later, plaintiff called Ms. Hoffman again to inquire why the hold had not been lifted. (Id.) Ms. Hoffman informed plaintiff that the Brady Health Center would not lift the hold. (Id. at 10–11). On April 16, 2018, plaintiff emailed Ms. Smith, Mr. Bowling, and Ms. Hoffman, asking again for permission to take two online classes and then transfer as well as access to his transcripts. (Id. at 11). The hold was not lifted, however, and plaintiff was not able to register for classes for the summer or fall semester. (Id.)

There is no evidence in the record of any further communication between plaintiff and defendants until July 27, 2018, when plaintiff filed a disability discrimination complaint against FSU with the Maryland Higher Education Commission ("MHEC") and requested to take online classes. (Id. at 11–12). In response, FSU stated that its position was that FSU offered plaintiff multiple opportunities to correct his noncompliance with FSU's immunization policy, but that plaintiff failed to do so. (ECF No. 22-5 at 28). The next communication between the parties in the record takes place on or about November 3, 2018, when plaintiff emailed his academic supervisor, Kenneth Levitt, to inquire about his status as a student and registering for classes for

the winter semester. (ECF No. 22-2 at 12). Mr. Levitt stated that he was no longer listed as plaintiff's advisor and copied Tamera Shockey, an employee at the Advising Center for the College of Business (ECF No. 23-2 at 16), to assist plaintiff. (ECF No. 22-2 at 13). On or about November 8, 2018, plaintiff received a letter from FSU stating that he was readmitted as a student for the winter semester. (Id.; ECF No. 22-6 at 19). That same day, he received an email from Ms. Shockey stating that the Office of Admissions was processing his request to register for classes. (ECF Nos. 22-2 at 13, 22-6 at 21). By this time, however, plaintiff had enrolled as a student at the Community College of Baltimore County for the winter semester. (ECF No. 22-2 at 13).

On or about November 20, 2018, the Philadelphia Office of Civil Rights ("OCR") informed plaintiff that it was investigating plaintiff's MHEC complaint. (Id. at 14). On February 15, 2019, plaintiff mailed his notice of claim to the state of Maryland pursuant to the Maryland Tort Claims Act. (Id. at 15). On March 6, 2019, plaintiff engaged in mediation through the OCR, but this mediation was unsuccessful. (Id.) Plaintiff filed the instant complaint on March 15, 2019 (ECF No. 1), and an Amended Complaint on March 16, 2019 (ECF No. 2), alleging that defendants discriminated against him on the basis of his disability in violation of Title II[2] of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("Title II" or the "ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Specifically, plaintiff brought one claim alleging intentional disability discrimination in violation of the ADA,

---

[2] While plaintiff brings suit pursuant to the Americans with Disabilities Act generally (ECF No. 1 at 11–12), Title II is the governing statute for discrimination against an individual with a disability by exclusion from participation in or denial of benefits of the services, programs, or activities of a public entity. 42 U.S.C. 12132; Davis v. Univ. of N.C., 263 F.3d 95, 98 (4th Cir. 2001). Here, plaintiff alleges that he was discriminated against by Frostburg State University, a public higher education institution within the state of Maryland, on the basis of his disability. Accordingly, Title II is the applicable section of the Americans with Disabilities Act. See Davis, 263 F.3d at 98; Class v. Towson Univ., 806 F.3d 236, 239 (4th Cir. 2015).

one claim alleging that defendants failed to accommodate his disability in violation of the ADA, one claim alleging intentional disability discrimination in violation of Section 504, and one claim alleging that defendants failed to accommodate his disability in violation of Section 504. (ECF No. 2 at 11–15). On April 18, 2019, defendants moved to dismiss the complaint or, in the alternative, for summary judgment, arguing that plaintiff's four counts all fail as a matter of law. (ECF No. 18-1 at 7).

## III.  DISCUSSION

Plaintiff alleges that defendants discriminated against him on the basis of his disability in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. (ECF No. 2 at 11–15). Specifically, plaintiff alleges that defendants violated Title II and Section 504 by refusing to permit him to continue his education at FSU and refusing to release plaintiff's academic transcripts to institutions that plaintiff sought to transfer to after he was unable to register for classes at FSU. (Id. at 11, 14).

"Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" Davis v. Univ. of N.C., 263 F.3d 95, 98 (4th Cir. 2001) (quoting 42 U.S.C. § 12132). "Such discrimination is similarly proscribed by the Rehabilitation Act." Id. (citing 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); 29 U.S.C. § 794(b)(2)(A) (defining "program or activity" as including all operations of "a college,

university, or other postsecondary institution")).  Accordingly, to state a claim under either Title

II or Section 504[3], plaintiff must establish that: "(1) [he] has a disability as defined by the acts;

(2) [he] is otherwise qualified for the benefit or program at issue; and (3) [he] was excluded from

the benefit or program on the basis of h[is] disability."  Id. at 99 (citing Baird v. Rose, 192 F.3d

462, 467 (4th Cir. 1999); Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)).

For purposes of this motion only, defendants assume that plaintiff had a qualifying disability and,

therefore, the first element of plaintiff's claims are not at issue.  (ECF No. 18-1 at 7 n.3).

Defendants argue, however, that plaintiff cannot establish the second or third elements, as he was

not otherwise qualified for the benefit or program at issue and he was not excluded from the

benefit or program on the basis of his disability.  (Id. at 10).  For the reasons discussed below, I

conclude that there are factual disputes regarding the second and third elements which render

summary judgment inappropriate.

### A.  "Otherwise Qualified" Individual

To establish the second element, that he was "otherwise qualified," plaintiff must show

"(1) that he could satisfy the essential eligibility requirements of the program . . . and (2) if not,

whether 'any reasonable accom modation by [FSU] would enable' [him] to meet these

requirements."  Class v. Towson Univ., 806 F.3d 236, 245–46 (4th Cir. 2015) (quoting Halpern

v. Wake Forest Univ. Health Sciences, 669 F.3d at 454, 462 (4th Cir. 2012)).  "In the context of

postsecondary education, a disabled person is qualified if he shows that he 'meets the academic

and technical standards requisite to admission or participation in the [school's] education

---

[3] "Claims under Title II of the ADA and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'"  Innes v. Bd. of Regents of the Univ. Sys. of Md., 29 F. Supp.3d 566, 577 n.5 (D. Md. 2014) (quoting Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995); Rogers v. Dep't of Health & Envtl. Control, 174 F.3d 431, 433–34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa)).

program or activity.'" <u>Id.</u> at 246 (citing 45 C.F.R. § 84.3(l)(3); 42 U.S.C. § 12131(2); <u>Knapp v. Northwestern Univ.</u>, 101 F.3d 473, 482 (7th Cir. 1996). "The term 'technical standards' refers to <u>all</u> nonacademic admissions criteria that are essential to participation in the program in question." <u>Id.</u> (quoting <u>Southeastern Cmty. Coll. v. Davis</u>, 442 U.S. 397, 406 (1979)). "A nonacademic eligibility criterion is essential if it 'bear[s] more than a marginal relationship to the [program] at issue.'" <u>Id.</u> (quoting <u>Halpern</u>, 669 F.3d at 462). "In determining whether an educational institution's eligibility requirement is essential and whether it has been met, we accord a measure of deference to the school's professional judgment." <u>Id.</u> (citing <u>Halpern</u>, 669 F.3d at 462–63; <u>Davis</u>, 263 F.3d at 102). In according deference, however, "we still must take special care to ensure that eligibility requirements do not 'disguise truly discriminatory requirements.'" <u>Id.</u> (quoting <u>Halpern</u>, 669 F.3d at 463).

### 1. Student Loan Debt

Defendants first argue that plaintiff was not "otherwise qualified" because he failed to repay his student loan debt to FSU in a timely manner. (ECF No. 18-1 at 8). On December 19, 2017, plaintiff took out a $1,000 temporary student loan from the Frostburg State University Foundation, Inc. ("FSUF"). (<u>Id.</u> at 4). The stated purpose of FSUF is to "administer[] several emergency loan funds which are designed to assist enrolled students in meeting short-term financial problems created by circumstances beyond the control of the student." (ECF No. 18-5 at 5). Plaintiff's loan application stated that the purpose of his loan was "[d]elayed financial aid from university, state, or federal sources." (<u>Id.</u>) Per FSUF's "Guidelines for Emergency Student Loans," the loan was to be repaid within 90 days, or by February 28, 2018. (<u>Id.</u> at 6). If plaintiff failed to repay the loan on time, plaintiff was notified that a financial "loan hold" would

be placed on his student account, which would prevent him from registering for classes for the following semester. (ECF Nos. 18-1 at 4, 18-5 at 6). The loan could be repaid by "[f]inancial aid assignment by borrower to FSUF" or "[d]irect repayment by borrower to FSUF by agreed upon schedule." (ECF No. 18-5 at 6). On plaintiff's loan application, "Grant (Pell or SEOG)/Refund" and "Student Loan 9Sub [sic]/Unsub)" were checked as "Verifiable Repayment Options." (Id. at 5).

Defendants argue that "[p]laintiff cannot show that he was 'otherwise qualified' as he left unpaid his overdue student loan through the end of the 2017/2018 academic year." (ECF No. 18-1 at 8). Defendants argue that FSU "has a public interest in ensuring that its students repay funds as a qualification for continued participation in its programs." (Id.) While plaintiff does not dispute this point, it is not clear from plaintiff's Opposition whether he concedes that defendants' requirement that students repay their loans in a timely manner is an "essential" eligibility criterion. Rather, plaintiff argues that he did not fail to meet the criterion and that his failure to repay the loan by February 28, 2018 was due to a mistake by defendants. (ECF No. 22-2 at 21). Specifically, plaintiff argues that he was not required to repay the $1,000 loan himself, but instead, that defendants were supposed to take that money out of his financial aid grant money for the semester. (Id.) Plaintiff further alleges that, when defendants failed to take the $1,000 out of his grant money, he eventually repaid the loan himself before the fall semester began. (Id.)

Here, the parties have not fully addressed the threshold question of whether defendants' requirement is "essential." For the purposes of this motion, however, I will assume, without concluding, that the requirement is "essential," because it is clear that there is a genuine dispute

of material fact as to whether plaintiff failed to meet defendants' requirement of repaying student loans in order to be eligible to register for classes for the summer and fall semesters. While plaintiff was required to repay the loan by February 28, 2018, under the terms of the loan, plaintiff's loan application did indicate that his "Verifiable Repayment Options" included a grant refund. (ECF No. 18-5 at 5). Further, plaintiff explicitly granted permission for his financial aid to be applied to repayment of the loan. (ECF No. 18-5 at 9). Accordingly, a reasonable jury could find that defendants mistakenly failed to apply plaintiff's financial aid to repayment of the FSUF loan and that plaintiff therefore did not fail to meet defendants' eligibility criterion. In sum, defendants have failed to meet their burden of establishing that there is no genuine dispute of material fact as to whether plaintiff fulfilled defendants' eligibility requirement of repaying student loan debt in a timely manner prior to registering for classes, and summary judgment is not proper on this issue.

### 2. Vaccinations

Defendants also argue that plaintiff cannot show that he was "otherwise qualified" to attend FSU given his failure to comply with defendants' immunization policy. Defendants' immunization policy states that "[a]ll new and transfer students . . . are required to provide proof of immunity to measles (rubeola), mumps, rubella and tetanus/diphtheria/pertussis." (ECF No. 18-3 at 8). Specifically, as to measles, mumps, and rubella ("MMR"), defendants' policy states that "[t]hose born after 1956 without lab evidence of disease or other evidence of immunity must provide documentation of two doses of MMR vaccine at least 28 days apart after 12 month [sic] of age." (Id.) As to tetanus, diphtheria, and pertussis, defendants' policy requires "proof of booster dose of Td or Tdap within the 10 years prior to matriculation." (Id.) The policy also

states that "[s]tudents in non-compliance with these requirements will be blocked from registration. If a temporary lift is granted, they must complete all requirements no later than early registration for the next semester or registration will be blocked." (Id. at 9). Defendants allow two exemptions from this policy: 1) medical, with "documentation from health care provider verifying medical contraindication to a specific vaccine(s)," and 2) religious, with "completion of Request for Religious Exemption form along with counseling by health care center staff." (Id. at 10).

Here, plaintiff did not supply any proof of vaccination for MMR or tetanus, diphtheria, and pertussis. In October of 2017, plaintiff walked into the Brady Health Center and advised Ms. Smith, the Nurse Practitioner and Director of the Brady Health Center, that he took immunosuppressants to treat his rheumatoid arthritis and therefore could not be vaccinated. (ECF No. 22-2 at 3–4). Plaintiff informed defendants that he was vaccinated as a child but could not obtain his immunization records. (ECF No. 18-1 at 3). Plaintiff also stated that he received a tetanus vaccine in 2011 at Good Samaritan Hospital in Baltimore. (Id. at 4). Ms. Smith informed plaintiff that he could complete a form to release his tetanus vaccine records from Good Samaritan Hospital to the Brady Health Center, but plaintiff declined to do so. (Id.) Plaintiff also declined to sign a religious exemption waiver or take a MMR antibody blood titer's test, which would indicate if he previously received these vaccines. (Id.)

In March of 2018, plaintiff also spoke to several officials, including FSU's general counsel, Bradford Nixon, FSU's Americans with Disabilities Act/Equal Employment Opportunity and Immigration Compliance Coordinator Beth Hoffman, and FSU President Ronald Nowacyzk, whom plaintiff alleges told him that he could satisfy the policy by getting a

medical waiver from his doctor. (ECF No. 22-2 at 7–10). On April 6, 2018, plaintiff provided a letter from his doctor stating that he was not able to receive vaccinations that contain live viruses, such as the MMR vaccination, due to his immunocompromised state. (ECF No. 18-1 at 4). The letter did not address plaintiff's eligibility to receive vaccinations that do not contain live viruses, including the vaccinations for tetanus, diphtheria, and pertussis. (Id. (citing ECF No. 18-3 at 6)). Accordingly, defendants argue that "even if [p]laintiff had a medical basis for not taking the MMR vaccination, [p]laintiff cannot show that he was 'otherwise qualified' given he failed to supply documentation of his tetanus vaccination from Good Samaritan Hospital or of a diphtheria vaccine." (Id. at 9).

Plaintiff bears the burden of establishing that he was "otherwise qualified" to attend FSU by showing "(1) that he could satisfy the essential eligibility requirements of the program . . . and (2) if not, whether 'any reasonable accommodation by [FSU] would enable' [him] to meet these requirements." Class, 806 F.3d at 245–46 (quoting Halpern, 669 F.3 at 462). In their Motion, defendants do not argue that plaintiff was not "otherwise qualified" to attend FSU due to his failure to provide proof of immunity for MMR. Defendants do, however, argue that plaintiff failed to comply with their immunization policy by providing proof of immunity to tetanus/diphtheria/pertussis, specifically, by providing "proof of booster dose of Td or Tdap within the 10 years prior to matriculation." (ECF No. 18-3 at 8). Accordingly, defendants argue, plaintiff could not satisfy FSU's essential eligibility requirement, i.e., compliance with their immunization policy. (Id.) Plaintiff disputes this point, and argues that he was "otherwise qualified" to attend FSU. (ECF No. 22-2 at 22).

As previously noted, an eligibility requirement is considered "essential" if "it 'bear[s] more than a marginal relationship to the [program] at issue.'" Class, 806 F.3d at 246 (quoting Halpern, 669 F.3d at 462). When considering whether a requirement is essential, the court accords deference to the school's professional judgment, although it "still must take special care to ensure that eligibility requirements do not 'disguise truly discriminatory requirements.'" Id. (quoting Halpern, 669 F.3d at 463). Here, defendants argue that their policy is based on their "compelling interest in controlling disease among [FSU's] student population." (ECF No. 18-1 at 10). Defendants also note that FSU's "public health objectives for its community was [sic] based on sound medical research by the [Centers for Disease Control ("CDC")]." (Id. at 11). Accordingly, defendants argue, "[t]he immunization policy's goal of protecting students and the community from these diseases bears 'more than a marginal relationship' to Frostburg State's program." (ECF No. 25 at 2). For the purposes of this motion, I will again assume, without concluding, that the requirement is "essential," because there are genuine disputes of material fact as to whether plaintiff could satisfy the immunization policy and, if not, whether any reasonable accommodations would allow him to satisfy the immunization policy, that render summary judgment inappropriate at this time.

In this case, plaintiff can establish that he was "otherwise qualified" to attend FSU by showing (1) that he could satisfy the immunization policy or (2) that a reasonable accommodation by FSU would enable him to satisfy that policy. Class, 806 F.3d 236, 245–46 (4th Cir. 2015) (quoting Halpern, 669 F.3d at 462 (4th Cir. 2012)). Here, there are factual disputes regarding whether plaintiff was unable, because of his disability, to obtain non-live vaccinations, such as tetanus, required for compliance with the immunization policy. In his First

Declaration, plaintiff states that he is "medically ineligible to get live vaccinations because of [his] immunocompromised state." (ECF No. 22-4 at 2). He does not state, however, whether he is medically ineligible to receive non-live vaccinations, such as tetanus.[4] He also states, however, that, at the time, he "was not sure what vaccines Mrs. Smith was trying to give [him]" and that he "did not know the difference between live and non-live vaccines." (ECF No. 22-8 at 11). Further, while Dr. Miller's letter only indicates that plaintiff was unable to receive live vaccines, the record is unclear as to exactly what was asked of Dr. Miller and, therefore, whether plaintiff was able to receive non-live vaccines. Finally, while defendants argue that plaintiff informed defendants that he had previously received a tetanus vaccine, it is unclear whether documentation of this vaccine exists, or whether he received this vaccine before the onset of his disability. In sum, because there are factual disputes about whether plaintiff could receive non-live vaccinations, there is a genuine issue of material fact as to whether plaintiff could satisfy defendants' immunization policy by providing proof of immunity to tetanus, diphtheria, and pertussis. (ECF No. 18-3 at 8); Class, 806 F.3d 236, 245–46 (4th Cir. 2015) (quoting Halpern, 669 F.3d at 462 (4th Cir. 2012)).

Similarly, there are factual disputes regarding whether, if plaintiff could not satisfy the immunization policy, a reasonable accommodation would allow him to satisfy said policy. Class, 806 F.3d 236, 245–46 (4th Cir. 2015) (quoting Halpern, 669 F.3d at 462 (4th Cir. 2012)). As noted above, defendants allow two exemptions from their immunization policy: 1) medical, with "documentation from health care provider verifying medical contraindication to a specific vaccine(s)," and 2) religious, with "completion of Request for Religious Exemption form along

---

[4] I note that, in his Second Declaration, plaintiff states that "a potential side effect of TDaP is [a]naphylactic shock which [he] had encountered before with another medication and almost died," although he does not detail whether this renders him unable to receive TDaP because of his disability. (ECF No. 22-8 at 4).

with counseling by health care center staff." (ECF No. 18-1 at 10). This first exemption was reiterated by several university officials, including FSU's general counsel, American with Disability Act/Equal Employment Opportunity and Immigration Compliance Coordinator, and President, who told plaintiff that he could comply with the policy by providing a medical waiver from his doctor. (ECF No. 22-4 at 7–9). Plaintiff then attempted to obtain the necessary medical information by providing a note from his doctor, Dr. John Miller. (ECF No. 22-2 at 9). Defendants argue that this letter was insufficient because it did not address plaintiff's ability to obtain non-live vaccinations. (ECF No. 18-1 at 9). As previously noted, however, the record is unclear as to whether Dr. Miller was asked to address non-live vaccinations in his letter.

Additionally, while Ms. Smith states in her declaration that she informed Dr. Miller of this deficiency when she "personally sent a response letter to Dr. John Miller reiterating that University immunization policy also requires proof of Tdap every 10 years" (ECF No. 23-3 at 4) and that she followed up that letter "with a call to Dr. Miller's office to supply the Tdap documentation," the letter itself does not clearly request such information. (Id. at 22). Instead, the letter merely advises Dr. Miller of the policy and that said policy follows guidelines established by the American College Health Association following Center for Disease Control recommendations. (Id.) Similarly, there is no evidence in the record that defendants informed plaintiff that his waiver was insufficient or asked plaintiff to have Dr. Miller supply documentation regarding his ability to receive non-live vaccinations. Rather, after defendant received Dr. Miller's letter in April of 2018, there appears to have been an abrupt halt to the ongoing dialogue between plaintiff and defendants regarding alternative ways that plaintiff could satisfy the immunization policy. Then, in November of 2018, plaintiff was inexplicably

readmitted to FSU, although there is no evidence in the record that plaintiff complied with the immunization policy, or that plaintiff and defendants had any further discussions regarding potential accommodations. This sequence of events gives rise to factual issues regarding whether plaintiff could satisfy defendants' immunization policy or whether a "reasonable accommodation," i.e., a medical exemption, would allow him to meet that requirement.

Viewing all facts and making all reasonable inferences in the light most favorable to plaintiff, as the nonmoving party, I find that, based on the current record, there are genuine issues of material fact as to whether plaintiff was "otherwise qualified" to attend FSU. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Class, 806 F.3d at 245–46 (quoting Halpern, 669 F.3d at 462). While discovery may resolve these factual issues[5], summary judgment regarding the second element of plaintiff's claims is inappropriate at this time.

## B. Exclusion from FSU on the Basis of a Disability

To establish the third element of a claim under Title II or Section 504, a plaintiff must show that "[he] was excluded from the benefit or program on the basis of [his] disability." Davis v. Univ. of N.C., 263 F.3d 95, 99 (4th Cir. 2001) (citing Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999); Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)). Specifically, as to the third element, "[t]he Fourth Circuit has recognized 'three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations.'" Innes v. Bd. of Regents of the Univ. Sys. of Md., 29 F. Supp. 3d 566, 577–78 (D. Md. 2014) (quoting A Helping Hand, LLC v. Baltimore Cty., Md., 515 F.3d 356, 362 (4th Cir. 2008)). Here, Counts I and III of plaintiff's Amended Complaint assert the

---

[5] I note that the parties have not had the benefit of discovery. After the record is developed through discovery, it may be that there are no factual disputes remaining.

first ground, intentional discrimination, and Counts II and IV of plaintiff's Amended Complaint assert the third ground, failure to make reasonable accommodations. (ECF No. 2 at 11–15).

### 1. Intentional Discrimination

In the first and third counts of his Amended Complaint, plaintiff alleges that "[d]efendants, with ill will, evil motive, and actual malice, discriminated against [p]laintiff based on his disability by refusing to permit him to continue his education at [d]efendant Frostburg State University (having refused to permit [p]laintiff to register for his Summer 2018 and Fall 2018 academic sessions classes)." (ECF No. 2 at ¶¶ 25, 33). Plaintiff further alleges that defendants also discriminated against him by "refus[ing] to release [p]laintiff's academic transcripts to institutions [p]laintiff sought to transfer to after realizing [d]efendant essentially kicked him out of [d]efendant Frostburg State University as a student." (Id.)

This court has previously stated that "the level of proof necessary for finding intentional discrimination under [the] Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result." Adams v. Montgomery College (Rockville), 834 F. Supp. 2d 386, 394 (D. Md. 2011) (quoting Proctor v. Prince George's Hosp. Ctr., 32 F. Supp. 2d 820, 829 n.6 (D. Md. 1998)). Further, "[d]efendants intentionally violate the ADA and the Rehabilitation Act by demonstrating deliberate indifference when they '[have] notice of the potential risk of their decision, and clearly [refuse] the accommodation knowingly.'" Id. (quoting Proctor, 32 F. Supp. 2d at 829). Plaintiff need not establish that defendants acted with "discriminatory animus" to recover damages, but rather, must establish that defendants "'acted knowingly, voluntarily, and deliberately,' even if the violations resulted

from mere 'thoughtlessness and indifference rather than because of any intent to deny [p]laintiff's rights.'" Id. (quoting Proctor, 32 F. Supp. 2d at 828).

Here, defendants argue that plaintiff was not "excluded on the basis of his disability," but rather, that he was not allowed to register for classes because he failed to comply with defendants' immunization policy. (ECF No. 18-1 at 10). Defendants further argue that these "objectives and policies were implemented based on CDC recommendations for disease control." (ECF No. 18-1 at 10 n.4). In response, plaintiff disputes this point, and argues that these reasons are pretext for discriminatory animus. (ECF No. 22-2 at 23). Defendants argue, however, that plaintiff cannot overcome defendants' "legitimate, nondiscriminatory reasons for its actions," as plaintiff cannot establish that FSU's "compelling interest in controlling disease among its student population" was pretextual. (ECF No. 18-1 at 11).

As previously discussed, there is a genuine issue of material fact as to the threshold question of whether plaintiff (1) he could satisfy defendants' immunization policy and (2) if not, whether a reasonable accommodation by defendants would allow him to satisfy that policy. Class, 806 F.3d at 245–46 (quoting Halpern, 669 F.3d at 462). On the second prong of this inquiry, there are factual disputes regarding whether plaintiff could comply with the immunization policy through reasonable accommodation, i.e., by obtaining a medical exemption to the policy. Given that, here, defendants' sole argument is that plaintiff was not allowed to register because he failed to comply with defendants' immunization policy, and there are factual disputes regarding whether plaintiff could actually comply with the policy, it follows that there is a genuine issue of material fact regarding defendants' intent. Specifically, there are factual disputes as to whether defendants did not allow plaintiff to register because he did not, and

indeed, could not, comply with defendants' policy. These factual disputes become even more apparent when considering defendants' course of conduct with plaintiff. As previously noted, the parties engaged in an ongoing dialogue for the plaintiff's first two semesters, but communications abruptly ended after plaintiff provided his doctor's note. While defendants argue that this note was insufficient, there are factual disputes as to whether there was any meaningful follow-up with either Dr. Miller or plaintiff about what exactly was missing and what was needed to correct these deficiencies. Further, the fact that, in November of 2018, plaintiff was readmitted without any apparent change in circumstances raises factual questions regarding the basis for defendants' prior refusal to allow plaintiff to register for classes.

In sum, viewing all facts and making all reasonable inferences in the light most favorable to plaintiff, I find that, based on the current record, there are genuine issues of material fact as to whether defendants acted with deliberate indifference by refusing to allow plaintiff to register for classes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Adams, 834 F. Supp. at 394 (quoting Proctor, 32 F. Supp. 2d at 829 n.6). Accordingly, summary judgment is inappropriate as to Counts I and III of plaintiff's Amended Complaint (ECF No. 2).

### 2. Failure to Accommodate

In the second and fourth counts of his Amended Complaint (ECF No. 2), plaintiff alleges that "[d]efendants, with ill will, evil motive, and actual malice, simply refused to provide [p]laintiff with a reasonable accommodation to complete his bachelor's degree and master's degree and stay enrolled as a student at [d]efendant Frostburg State University." (ECF No. 2 at ¶¶ 29, 37). Plaintiff further alleges that "[a] reasonable accommodation would have been as simple as allowing [p]laintiff to register for his Summer 2018 and Fall 2018 academic classes at

[d]efendant Frostburg State University" after, at the direction of FSU officials, plaintiff provided a medical waiver to defendants on or about April 6, 2018. (Id.) Alternatively, plaintiff offered to take two online classes in the fall of 2018 and then transfer to another school. (Id. at ¶ 16). Plaintiff further alleges that "any reasonable accommodation the [d]efendants could have provided [p]laintiff for his disability would not impose an undue hardship on the [d]efendants." (Id. at ¶¶ 29, 37). In this context, plaintiff argues that he was excluded from a public benefit or program on the basis of his disability because defendants failed to reasonably accommodate him so that he could continue to take classes at FSU.

Title II of the Americans with Disabilities Act instructs that "'[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" Adams v. Montgomery College (Rockville), 834 F. Supp. 2d 386, 393 (D. Md. 2011) (quoting 28 C.F.R. § 35.130(b)(7)). "Based on this provision, the Fourth Circuit has held that Title II of the ADA and the Rehabilitation Act require public entities to make reasonable accommodations for persons with disabilities." Id. (citing A Helping Hand, LLC v. Baltimore Cty., 515 F.3d 356, 362 (4th Cir. 2008); Waller ex rel. Estate of Hunt v. City of Danville, 556 F.3d 171, 174–75 (4th Cir. 2009); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 488 (4th Cir. 2005)). Specifically, in the context of public higher education, state colleges and universities are required "to make reasonable accommodations for disabled students to ensure that they are able to participate in the educational program." Constantine, 411 F.3d at 488. While states are required to "make "'reasonable' modifications to

their educational programs in order to ensure that disabled citizens have access to those programs," id. at 489 (citing Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001)), states are not required "to employ any and all means to make . . . services accessible to persons with disabilities . . . [or] to compromise their essential eligibility criteria for public programs.'" Id. at 488–89 (quoting Tennessee v. Lane, 541 U.S. 509, 531–32 (2004)).

Here, plaintiff first argues that he should have been allowed to register for Summer 2018 and Fall 2018 academic classes. Defendants argue, however, that they were not required to allow plaintiff to register for classes because he failed to comply with defendants' essential eligibility criteria, i.e., their immunization policy, by submitting proof of immunity for tetanus, diphtheria, and pertussis or documentation of any vaccination. (ECF No. 18-1 at 14). As previously discussed, however, there are genuine issues of material fact as to whether plaintiff could satisfy defendants' immunization policy and, if not, whether he could comply with the policy through a reasonable accommodation, i.e., a medical exemption. Class, 806 F.3d at 245–46 (quoting Halpern, 669 F.3d at 462). There is also a factual dispute about whether it would have been reasonable for defendants to allow plaintiff to register for classes for the subsequent semesters, given that he was ultimately readmitted in the fall without any change in circumstance[6] or whether allowing plaintiff to register for classes would "compromise [defendants'] essential eligibility criteria for public programs." See Constantine, 411 F.3d at 488 (quoting Lane, 541 U.S. at 531–32).

---

[6] Upon inquiry from the court at the August 5, 2019 motions hearing, defendants argued that plaintiff ultimately would not have been allowed to register for classes if he failed to comply with the immunization policy, I note that the current record is unclear as to whether plaintiff's 'readmission' was sufficient to allow him to register for classes.

Plaintiff also argues that, as a compromise, he offered to take two online classes during the fall semester before transferring to a different school. (ECF No. 22-2 at 8). Defendants argue, however, that this proposed accommodation "was illusory because under Frostburg State's academic requirements, his undergraduate business major program was not an 'online only program,' and he would have had to return to campus." (Id. at 15). Here, it appears that defendants may be asserting an "undue burden" or "fundamental alteration" defense. See Halpern, 669 F.3d at 464. Here, however, there are factual disputes as to whether either defense applies, given the short-term, temporary nature of the plaintiff's proposed accommodations. Specifically, plaintiff did not seek to obtain an online business degree as plaintiff appears to assert, but merely sought the opportunity to take two classes online pending his transfer. Accordingly, there is a genuine issue of material fact as to whether this proposed accommodation was reasonable.

Viewing all facts and making all reasonable inferences in the light most favorable to plaintiff, as the nonmoving party, I find that, based on the current record, there are factual issues as to whether defendants made reasonable accommodations for plaintiff to ensure that plaintiff could participate in defendant's educational program. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Constantine, 411 F.3d. at 488. Accordingly, summary judgment is inappropriate as to Counts II and IV of plaintiff's Amended Complaint (ECF No. 2).

**C. Damages for Lost Pay**

Finally, defendants ask the court to grant summary judgment to defendants on plaintiff's claim "for lost earning capacity based on his recent representations to and classification by the Social Security Administration that he is unable to do substantial work." (ECF No. 18-1 at 18).

Specifically, defendants argue, plaintiff demands damages for his "present and future earning capacity/power" (ECF No. 2 at ¶ 38), yet in 2016, he "represented to an Administrative Law Judge of the Social Security Administration ("SSA") that he is unable to engage in any substantial employment due to his disability." (ECF No. 18-1 at 18). In response, plaintiff argues that there are differences in his circumstances between his past and present situation, and that, given these changed circumstances, he should be allowed to present evidence regarding his potential loss of future earning power. (ECF No. 22-2 at 34).

"The Supreme Court has held that receipt of social security disability benefits does not automatically disqualify a person from making a claim under the Americans with Disabilities Act." Gilles v. Pleasant Hill Elementary School Dist. No. 69, No. 09–1335, 2011 WL 5005995, at *5 (C.D. Ill. Oct. 20, 2011) (citing Cleveland v. Policy Mgt. Systems Corp., 526 U.S. 795 (1999)). "The Court added, however, that contradictions are unacceptable; factual representations made to obtain those benefits may not be later denied." Id. In each case cited by defendants, however, the court focused on the precise factual representations made by plaintiff in the SSA proceedings. See id.; Cavaliere v. Advert. Specialty Inst., Inc., 853 F. Supp. 2d 472, 487 (E.D. Pa. 2012); Christou v. Hyatt Regency-O'Hare, 996 F. Supp. 811, 815 (N.D. Ill. 1998). Here, as those factual representations are not part of this record, the court cannot undertake the analysis necessary to determine if plaintiff is judicially estopped from seeking lost wages. Accordingly, summary judgment on issue of damages is inappropriate at this time, and defendants' Motion (ECF No. 18) is denied as to this issue.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion (ECF No. 18) is DENIED.   A separate order will be issued.

Date:   September 6, 2019                                    _____/s/_____
                                                            Beth P. Gesner
                                                            Chief United States Magistrate Judge